1. "A contract upon which specific performance is sought must be certain, definite and clear, and so precise in its terms that neither party can reasonably misunderstand it." Studer v. Seyer, 69 Ga. 125, 126. Moreover, since specific performance is an altogether equitable remedy, and not one which can be demanded, merely by virtue of a proven agreement, as a matter of absolute right, it must be made to further appear that the contract is equitable and just, and a court will be justified in refusing a decree of performance should inadequacy of price appear, or any other fact showing the contract to be unfair, or unjust, or against good conscience. Code, § 37-805; Coleman v. Woodland Hills Co., 196 Ga. 626
(27 S.E.2d 226). Thus, if the alleged contract sued on be based on an oral agreement to convey or devise land in consideration of the performance of ordinary personal services, the petition must not only show that the contract is precise in its terms, but must also allege the value of such services and the value of the land or specific data from which such relative values can be determined. Johns v. Nix, 196 Ga. 417, 418 (26 S.E.2d 526), and cit. Exceptions to the general rule as to the necessity for averments as to the value of services may exist in cases involving virtual adoption or contracts between near relatives, where one goes into the home of the other agreeing to nurse and give the other personal, affectionate, and considerate attention, such as could not readily be procured elsewhere, and where the value of such services could not be readily computed in money. Potts v. Mathis, 149 Ga. 370 (100 S.E. 110); Brogdon v. Hogan, 189 Ga. 250 *Page 770 
(5 S.E.2d 657); Hankinson v. Hankinson, 168 Ga. 156, 158 (147 S.E. 106).
2. The instant petition for specific performance is based on an alleged oral agreement, between an uncle and his nephew, to make a will and devise certain realty to the petitioner in consideration of personal services to be rendered the decedent during his life, a portion of which was set forth as being of a personal and intimate nature. The petition is attacked on general demurrer, and it is urged that sufficient facts are not alleged to show a contract; that the terms of the oral agreement are not sufficiently clear to authorize a decree of performance; and further that the allegations of the petition with respect to the value of the alleged services rendered were not sufficient to make it appear that the contract is equitable and just. The allegations of the petition as amended, insofar as they relate to the questions here presented, are set forth fully in the statement of facts, to which reference is made.
(a) The petition was good as against general demurrer, in that the date of the alleged contract sued on and the period for its performance are alleged; its terms are sufficiently clear, in that a valuable and adequate consideration with expressed mutual obligations is set forth, showing the relative values of the expressed and described services to be performed by the plaintiff and the expressed and described compensation to be received therefor. Actual performance by the plaintiff of the alleged contract and nonperformance by the deceased were also alleged.
3. Under the above rulings, the trial court erred in sustaining general demurrers and dismissing the petition as amended.
4. Since the trial court sustained the defendant's general demurrer and dismissed the petition as amended, a subsequent order sustaining certain demurrers to parts of the defendant's answer cannot be reviewed by this court on a cross-bill of exceptions filed by the defendant. This is true for the reason that the defendant's answer was filed subject to his general demurrer testing the sufficiency of the petition; and since the demurrers were sustained and the petition was dismissed, there were no longer any pleadings left in the case and all subsequent proceedings were necessarily nugatory. See Crawford v. Carter, 146 Ga. 526 (91 S.E. 780).
Judgment reversed on the main bill of exceptions; cross-bill dismissed. All the Justices concur, except Wyatt, J., who took no part in the consideration or decision of this case.
 Nos. 15958, 15963. OCTOBER 17, 1947.
 STATEMENT OF FACTS BY JENKINS, CHIEF JUSTICE.
Jim M. Bullard filed his petition, in the Superior Court of Calhoun County, against Mrs. Cora Tanner Bullard, as administratrix of the estate of J. M. Bullard, deceased, seeking to have specifically performed an alleged contract based upon an oral agreement between himself and J. M. Bullard, his uncle, under which his uncle agreed *Page 771 
to make a will and devise to the plaintiff certain described realty in consideration of the performance of personal services to the decedent during his lifetime. The petition alleged that J. M. Bullard and the defendant administratrix were married in July, 1938, when the said J. M. Bullard was about 70 years of age, and the said defendant was also well beyond middle age. It was alleged that J. M. Bullard died intestate on May 23, 1946, without leaving lineal heirs, and that his widow, the defendant, was his sole heir at law; that the estate of J. M. Bullard owed no debts; and that, in addition to the realty here contended for, the deceased possessed at his death 372 bales of cotton and had at least $8000 in cash. The allegations of the petition as amended with respect to the alleged contract, the terms of the agreement, and the value of the services rendered are as follows: Paragraph 8. "That on October 24, 1923, the said J. M. Bullard purchased the property which is described in paragraph four of the petition. Shortly thereafter, the exact date of which petitioner does not remember, but not more than ten days, the said J. M. Bullard stated to petitioner that, if he would continue to stay with and associate with him as he had heretofore done, assist him with his business, perform personal errands for him, do and perform all other things required of him by the said J. M. Bullard until his death, he would by his last will devise to petitioner the said lands herein referred to, known as the Mills Place. Petitioner accepted the proposal of his said uncle, and agreed to do all of those things required of him by his uncle until his death. At the time of making this agreement, petitioner's said uncle merely stated in a general way that he expected petitioner to help him with his business, with his farming operations, and to give him personal services and attention; all of these as he required them and called upon petitioner for them; and it was not contemplated or intended by the agreement between them that it would or could cover specific items of service. The sense and purpose of the agreement on the part of J. M. Bullard was that he desired the company and companionship of petitioner, and that petitioner would be available and willing to perform at all times any services required by, and any assistance needed by, him during the remainder of his life, and on the part of petitioner that he was expected to and would at all times do and perform all of those things required of him by the said J. M. Bullard." In *Page 772 
paragraph 9 of the petition it is alleged: "Petitioner in his early boyhood lived with his father on what is known as the old Bullard farm in Calhoun County, and the said J. M. Bullard also lived on said farm, petitioner's father cultivating one-half of the farm, and petitioner's uncle, J. M. Bullard, cultivating the other half. From petitioner's early boyhood his said uncle desired petitioner to stay with him, petitioner being the only son in his family, and the said J. M. Bullard having no family. Petitioner did spend a great deal of time, both day and night, with his said uncle from his early boyhood, as much so as if he had been the son of J. M. Bullard. The said J. M. Bullard desired and wanted petitioner to be with him, and the association of petitioner with his uncle became a fixed habit which the said J. M. Bullard wished to continue, and did continue until his death. When petitioner became twenty-one years of age, which was in the year 1929, petitioner married, thus assuming a family responsibility of his own. Petitioner has an uncle, who at that time was a locomotive engineer for the Georgia, Florida and Alabama Railway, who suggested to petitioner that he could obtain for him a job as fireman on this railroad, which if petitioner would accept he could himself in time become a locomotive engineer. When J. M. Bullard learned that petitioner was considering taking this railroad job, he requested petitioner not to do so. He reminded petitioner of the existing agreement between them to the effect that he, J. M. Bullard, had agreed to make a will and devise to petitioner his plantation in Calhoun County, known as the Mills Place; and that petitioner had agreed to stay with him until his death and perform for him all services which he might require of petitioner. The said J. M. Bullard then and there restated and reaffirmed the agreement made by him with petitioner in the month of October, 1923, and then and there agreed that, if petitioner would remain where he was, and would continue to perform all services required by him of petitioner until his death, he would make a will and devise to petitioner the lands which are described in paragraph four of this petition. As a result of this conversation and agreement, petitioner abandoned the idea of obtaining the railroad employment, and continued to perform his said agreement with his said uncle, J. M. Bullard. Petitioner was then living on the old Bullard farm, which is near the Mills Place, the farm of J. M. Bullard, and continued to do so, and later *Page 773 
purchased this farm, and lived there until he purchased a home still nearer to the home of J. M. Bullard, where he now lives." It was further alleged in paragraph 10 of the petition: "Petitioner accepted the proposal made by J. M. Bullard in October, 1923, then and there agreed to it, and at all times since said date performed all duties, and did all things which he was requested by the said J. M. Bullard to do for him. Petitioner in each and every year subsequent to the making of such agreement, among other things assisted the said J. M. Bullard in hiring labor for his said farm, in supervising the labor on said farm in the cultivation and harvesting of the crops, went with him upon all occasions, when asked by the said Bullard, which was many times, to assist him in the transaction of business matters; waited on him when he was sick, shaved him two to three times each week, went with him on nearly all trips which the said J. M. Bullard took and drove his automobile. Petitioner is a farmer by occupation, lived in a mile and a half of the home of the said J. M. Bullard, and had the knowledge and experience to enable him to perform the services required of him by the said J. M. Bullard." By amendment, it was further alleged in this connection as follows: "The services which petitioner performed for his uncle, J. M. Bullard, in connection with his farming operations are as follows: In each year from 1923 until the death of J. M. Bullard, petitioner weighed out to the share croppers on the farm their cotton seed, and peanut seed, and charged the same to them; he helped his uncle supervise the planting and cultivation of the crops, and gathering of the same. Twice each month during the crop-growing season he made out checks to the croppers for advances made to them, and charged them on his uncle's books. However, during the last four years of his uncle's life, his wife, the defendant, made out such checks, and charged them, but this was done upon her own volition, and not because petitioner refused to do it, he being still willing to do this. During all these years, from 1923 on to the death of J. M. Bullard, petitioner kept his books of account with his croppers, and made settlement with them in the fall of each year, until the last four years, when Mrs. Cora Bullard assumed to do this. J. M. Bullard always planted eight to ten acres of sugar cane each year, which his croppers cultivated, and had coming to them from the cane half of the syrup made. J. M. Bullard required petitioner to be present each day when *Page 774 
the syrup was being made, and divide it one can to J. M. Bullard and one can to the cropper whose cane was being made up into syrup as the same was being made. This required six to eight weeks of time each fall. The said J. M. Bullard frequently speculated in cotton futures, and required petitioner to drive him in his automobile to Albany, Ga., to a broker's office, where he would spend the day watching the movement of the cotton market. Petitioner is unable to say how often this occurred, from lack of recollection, over a long period of years. Also, his uncle required petitioner to drive him in his automobile wherever he wanted to go, and all of these trips together averaged at least 100 per year. Petitioner's relation to J. M. Bullard as to services performed by him for his uncle under the said agreement was not that of employer and employee, and was not so understood by either of them; and petitioner made no note of, or kept any account of the various items of services he performed for his uncle during the period of twenty-two years when he was carrying out his said agreement with his uncle, and it is now impossible for petitioner to itemize and state every single thing he did for his uncle. During this period of time petitioner held himself in readiness at all times to answer, and did answer, every call made upon him by his uncle; his said uncle having at all times first call upon petitioner's time and services, and which he obtained both day and night. In this situation petitioner was not able to make plans to develop and expand his own business, which was that of operating a small farm, because he was called upon practically every day by his uncle to perform some service for him, which petitioner under his agreement was bound to do. A substantial portion of the services which petitioner was called upon to perform under the agreement with his uncle were personal in their nature, such as being a companion to him, running errands for him, discussing his private business with him, and such as he could not secure from any one else, by employment; nor did his uncle wish to secure them from any one else, he having confidence in petitioner, and would not have entrusted to anyone else to do most of the things which he required of petitioner. J. M. Bullard was satisfied with petitioner's services to him through the period during which the said agreement was being performed, and evidenced his satisfaction a short time before his death by saying to Mrs. J. W. Bass, of Edison, Ga., that *Page 775 
he expected to sell all of his cotton at an early date, and then would make a will by which he would leave to petitioner his plantation, and also leave his wife amply provided for." As to the value of the services rendered and that of the property involved, the petition contains the following allegations in paragraphs 10-a and 10-b: "The services which petitioner performed for his uncle, J. M. Bullard, during the twenty years in which the agreement between petitioner and his said uncle was being performed were such, because of their personal nature, that his uncle could not have procured from anyone else; furthermore, his uncle did not desire to obtain such services from any one else, and would not have permitted any one else to perform them. The services which petitioner performed in the way of assisting his uncle in carrying on his farm work had an ascertainable value at the time they were performed; and since it was not the intent and purport of the agreement between petitioner and his uncle that such services would be paid for except in the manner specified in said agreement, to wit, by J. M. Bullard making a will and devising the Mills Place to petitioner, and since the period of time covered by the performance of the agreement is so long, and the items of service are so numerous, petitioner is unable for lack of knowledge and recollection to state them in detail, or to place a fixed value of money on each item of them; nor is petitioner suing for the cash value of these services. The personal services which petitioner performed for his uncle under the terms of the said agreement, such as almost constant companionship and company with his uncle, humoring his personal whims and notions, performing errands for him of a personal and private nature, going on trips with him of a personal and private nature, are of such a nature as cannot be valued in money. The petitioner shows that the market value of the Mills Place, the land described in paragraph four of this petition, at the time J. M. Bullard bought the same, and at the time he made the agreement with petitioner to devise the same to him by his last will, was $10,000. Petitioner alleges that the reasonable value of the services which he rendered to the said J. M. Bullard is $1000 per annum, over a period of twenty-two years, a total of $22,000."
The trial court sustained general demurrers to the petition as amended and dismissed the suit. The main bill of exceptions is brought from that order; the cross-bill of exceptions, from the *Page 776 
order sustaining certain demurrers and striking a portion of the defendant's answer, which order was entered after the petition had been dismissed on general demurrer.